IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| JANET L. CROSIER, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 06-0297-CV-W-ODS ) |
| JO ANNE BARNHART, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING DISABILITY INSURANCE BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her application for supplemental security income benefits and disability benefits under the Social Security Act. For the following reasons, the Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in September 1959, completed high school and some college classes. She last worked on January 21, 2003 (her alleged onset date), at which time she was terminated for excessive tardiness after fourteen and a half years employment as on operator for Southwestern Bell. R. at 32.

In December 1999, Plaintiff was assaulted outside her home; the assailant stole her purse and hit her in the head with it. She apparently qualified for temporary disability. On August 23, 2000, Plaintiff saw Dr. Otto Spurny with complaints of paresthesia[1] in her temple that she attributed to the mugging. Dr. Spurny's notes reflect Plaintiff was being treated by various psychiatrists, but none of their treatment records have been provided. Dr. Spurny opined Plaintiff was "severely stressed" and found "it

---

[1] According to Stedman's Medical Dictionary (27th Edition), paresthesia is "an abnormal sensation, such as burning, pricking, tickling, or tingling."

hard to imagine she would be able to function effectively at her job." He provided Plaintiff with samples of Serzone. R. at 162. On October 25, 2000, Plaintiff was very distraught over a variety of matters, including the impending expiration of her temporary disability and her doubts about her ability to return to work. Dr. Spurny provided her with samples of Prilosec and advised her to seek psychiatric care. R. at 159.

Plaintiff did not return to Dr. Spurny until May 31, 2002. She reported being "able to work 40-hour weeks as a telephone operator with an irregular schedule. She lives with her 15-year old son, drives her car, is able to take care of all her household needs and overall seems to be doing much better." Plaintiff had begun seeing a new psychiatrist (Dr. Ekkehard Othmer) and the purpose of Plaintiff's visit was not related to her depression or anxiety, so Dr. Spurny did not provide any medication for these ailments. R. at 155. Plaintiff returned to Dr. Spurny on June 4, 2002, at which time he described her as "a pleasant chronically depressed-appearing lady who however is capable of working 40 hours a week as a telephone operator." R. at 153. This is the last record of a visit to Dr. Spurny.

The Record is not clear as to when Plaintiff began seeing Dr. Othmer. The first evidence of a visit in the Record is dated March 13, 2002, but refers to a prior visit. Regardless, on March 13, Dr. Othmer noted Plaintiff's mood was stable with some valleys, and she was taking Serzone and Wellbutrin. R. at 174. On May 24 Plaintiff described her mood as "up and down," but on June 26 she reported feeling "really good mood wise." R. at 173. She also made positive reports (or failed to complain of any problems) during visits on July 25 and August 20. R. at 172. On October 23, Plaintiff reported she "still feels depressed." R. at 171.

On December 5, 2002, Plaintiff told Dr. Othmer "she was on the edge with her job." Dr. Othmer's writing is difficult to read, but it appears Plaintiff reported she had been late to work on several occasions, and she also had some "insurance issues." On January 8, 2003, she reported having problems at work in terms of her response time to calls, but her mood was good and she exhibited a sense of humor. R. at 170. On February 6, Plaintiff reported feeling "ok," and on February 26 she reported having

Case 4:06-cv-00297-ODS   Document 8   Filed 11/13/06   Page 2 of 8

"good energy for short periods" and her mood was stable, although she also reported "having some social withdrawal." R. at 169.

On March 11, Dr. Othmer described Plaintiff as "motivated not depressed" and described her as "goal directed." On April 4, Plaintiff reported a slight deterioration in her condition, but also admitted she had not been fully complying with the medication schedule Dr. Othmer had prescribed. R. at 168. In April and May Plaintiff reported feeling bored and tired. R. at 167. However, on June 4 she reported "feeling good" and that therapy was helping, although she expressed concern about being able to see the therapist as often as she liked now that she did not have insurance. On August 15 she told Dr. Othmer she believed the medication was working. R. at 166.

Plaintiff began seeing her therapist, Yvonne Thibault, in October 2000, but there are hardly any notes or records from these visits. In December 2002, Ms. Thibault wrote a letter to the insurance carrier as part of a review of the decision to terminate benefit payments for counseling. She determined Plaintiff suffered from post-traumatic stress disorder and had a GAF score of 45, and predicted the highest GAF score she could attain would be 55. R. at 196-98. On November 6, 2003, Ms. Thibault wrote a letter for Plaintiff in connection with this application for benefits. The letter identifies some of Plaintiff's problems and complaints, but does not orient them in time or provide a prognosis. For instance, Ms. Thibault reported "an inability to function in her daily life," but does not indicate when this complaint was made or how long this condition lasted.

On November 21, 2003, Dr. Othmer wrote a letter on Plaintiff's behalf, indicating Plaintiff reported she was terminated "because of tardiness and because she could not handle telephone calls in a speedy manner." He indicated Plaintiff's depression caused her to oversleep and be less efficient at work, and criticized Southwestern Bell for not offering sick leave or disability and the insurance company for terminating payments for the therapist. He also described her response to medication as "incomplete." R. at 230.

Plaintiff underwent a consultative examination in April 2005. The examining psychologist indicated Plaintiff was moderately limited in her abilities to interact with the

3

public, supervisors and co-workers and respond to changes in the work setting, and markedly limited in her ability to respond to pressure in the workplace. A "moderate" limitation was defined as "moderate limitation . . . .but the individual is still able to function satisfactorily," and a "marked" limitation was defined as "serious limitation . . . [t]he ability to function is severely limited but not precluded." R. at 238-39. The consulting psychologist's written report concludes Plaintiff suffers from a "a personality disorder, which could be contributing to her reports of dissociating and other symptoms generally associated with P.T.S.D. I do not think this client is clinically depressed at this time." The report also indicates Plaintiff is "capable of sustaining concentration and persistence while working on most simple tasks [and her] ability to interact socially and adapt to her environment appears to be moderately to seriously affected by her personality disorder." R. at 235-36.

On June 30, 2005 – despite not seeing Plaintiff since January 2004 – Dr. Othmer conducted a "re-evaluation." He described her "most difficult situation was an adjustment to work under time pressure." At her last appointment in January 2004, she announced she had stopped taking her medications "because she was not convinced that they were helpful." He concluded Plaintiff "is unable to work effectively and in a competitive environment. Since her treatment failed in the past, I believe that this disability is permanent." R. at 252-53. He filled out a form indicating Plaintiff had a "poor" ability (defined as "seriously limited, less than satisfactory but not precluded") to interact with supervisors, deal with stress, maintain attention and concentration, understand, remember and follow complex instructions, behave in a stable manner and relate predictably in social situations. The form also indicated Plaintiff had a "fair" ability (defined as "limited but satisfactory") to exercise judgment, function independently, and understand, remember and follow detailed and simple instructions. R. at 260-61.

During the administrative hearing on July 14, 2005, Plaintiff testified she was not depressed and did not have a "problem getting out of the house." She doubted she could return to her past job as a telephone operator because Southwestern Bell had a reduction in force and there were no openings. When asked whether she could work as a telephone operator, she indicated she had applied to several employers but none

4

were hiring. R. at 32-34. When asked the question again, she expressed doubt that she could "make it past on orientation process or . . . remember what they are trying to tell me to start." R. at 34. She still has anxiety attacks but "not very often;" they occur only when she has a confrontation of some sort. R. at 38. However, she had not had any recently. R. at 38-39. Plaintiff had found a doctor to prescribe, and was taking, Wellbutrin, which she described as "working" and "effective." R. at 40-41. She still has "periods of depression" it is not as severe and she has greater clarity. R. at 41. Nonetheless, she cannot concentrate and doubts she can learn new skills. R. at 41-42. She reported difficulty sleeping due to a combination of acid reflux disease and anxiety, but did not identify any limitations on her daily activities. R. at 42-44.

Dr. Stanley Golon testified as a medical expert. He observed Dr. Othmer's June 2005 report was inconsistent with his notes from when he was actually treating Plaintiff. R. at 52, 55. He concluded the records supported a finding Plaintiff was able to perform "simple unskilled work with limited action with others, particularly co-workers and supervisors." R. at 54. The ALJ recorded Dr. Golon's opinions with regard to a Mental Residual Functional Capacity Assessment Form. Dr. Golon indicated Plaintiff was moderately limited in her abilities to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods of time, complete a normal workweek and maintain a consistent pace, interact with the public, maintain socially accepted behavior, respond to changes in the workplace, and set realistic goals or make plans independent of others. Dr. Golon also indicated Plaintiff was markedly limited in her ability to accept instructions and respond to criticism from supervisors. R. at 54, 262.

A vocational expert ("VE") also testified. In response to a hypothetical assuming a person of Plaintiff's age, education and experience and the abilities and limitations identified by Dr. Golon, the VE testified that such an individual probably could not return to work as a telephone operator, but could work as a hand packager, production line inspector, clerical sorter, housekeeper, and stocker. R. at 56-57. When asked to assume the limitations identified in Dr. Othmer's June 2005 assessment, the VE testified such a person could not perform any work in the national economy. R. at 58.

5

The ALJ's findings were largely consistent with the opinions expressed by Dr. Golon.  In making these findings, the ALJ observed Plaintiff's testimony did not support the degree of disability she alleged, medical records and her statements reflected that medication had been effective in treating her, and there appeared to be no limitations in her daily activities.  R. at 21-22.  Based on the VE's testimony, the ALJ determined Plaintiff could not return to her past work as a telephone operator, but she could perform other work in the national economy.

## II.  DISCUSSION

Plaintiff's arguments effectively combine contentions regarding the sufficiency of the evidence and the ALJ's decision not to rely on Dr. Othmer's June 2005 report.  "[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole.  Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion.  [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion."  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted).  Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)).  Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

Generally speaking, a treating physician's opinion is entitled to deference.  This general rule is not ironclad; a treating physician's opinion may be disregarded if it is unsupported by clinical or other data or is contrary to the weight of the remaining evidence in the record.  E.g., Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).  Initially, the Court harbors doubt Dr. Othmer was Plaintiff's treating physician at the time he wrote his June 2005 report.  The deference normally afforded a treating physician's

6

opinion is justified by that physician's greater familiarity with the claimant's medical condition. E.g., Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991). Dr. Othmer had not seen Plaintiff in almost eighteen months, so his ability to document her condition in June 2005 was not informed by a continuing relationship and familiarity with her condition. Nonetheless, even if Dr. Othmer qualifies as a treating physician, the Record justifies the ALJ's decision not to defer to his opinion. Dr. Othmer's treatment notes reflect Plaintiff was responding well to medication and her condition deteriorated when she unilaterally decided to take less or no medication. These facts were confirmed by Plaintiff's testimony. Dr. Othmer's narrative supports a conclusion that Plaintiff cannot work as a telephone operator – a fact that was ultimately found by the ALJ – but Dr. Othmer lacks the expertise to determine Plaintiff is incapable of performing any work in the national economy. The limitations Dr. Othmer identified in his June 2005 report are inconsistent with Plaintiff's testimony and with Dr. Othmer's treatment notes from 2004 and before.

In addition to the evidence in the record regarding the efficacy of medication, Plaintiff testified she had been looking for work. This is not activity taken by someone who believes they are incapable of working. Moreover, in much of her testimony she indicates she could not work as a telephone operator because no jobs are available – not because she is incapable of doing the job. Plaintiff expressed concerns about completing an orientation process, but this concern is reflected in the ALJ's findings about Plaintiff's ability to adapt to new situations and understand and follow complicated instructions – and is ameliorated by the ALJ's finding (which is supported by substantial evidence in the record) that while Plaintiff is limited in many areas, she retains the ability to perform at a moderate level.

Plaintiff challenges the VE's testimony, finding it "unlikely" a person with Plaintiff's limitations could "meet the quota and time requirements of the jobs listed by the VE [or] whether an employer would find an individual with moderate limitations in all these areas able to 'satisfactorily function.'" Plaintiff's Brief at 20. The VE's testimony serves as substantial evidence supporting the ALJ's finding that Plaintiff can perform work in the national economy.

7

## III. CONCLUSION

For these reasons, the Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

                                        /s/ Ortrie D. Smith
                                        ORTRIE D. SMITH, JUDGE
DATE: November 13, 2006         UNITED STATES DISTRICT COURT